Elizabeth O'HALLORAN and Alan Burch, Plaintiffs,

v.

The UNIVERSITY OF WASHINGTON, et al., Defendants.

No. C87–1024M.

United States District Court,
W.D. Washington,
Seattle Division.

Feb. 25, 1988.

James B. Wilson, Office of the Atty. Gen., University of Washington, Seattle, Wash., for University of Washington.

Don Paul Badgley, Bogle & Gates, Seattle, Wash., John H. Kitchin, Swanson Midgley Gangwere Clarke & Kitchin, Kansas City, Mo., for Nat. Collegiate Athletic Assoc.

Bruce E.H. Johnson, David C. Tarshes, Davis Wright & Jones, Seattle, Wash., for plaintiffs.

### ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

McGOVERN, District Judge.

## I. PROCEDURAL AND FACTUAL BACKGROUND

The constitutionality of the University of Washington's (University) drug-testing program was challenged in King County Superior Court; when that Court ordered that the University join the National Collegiate Athletic Association (NCAA) as a third-party defendant, the NCAA removed the action to federal court. Plaintiff's Motion to Remand was denied.

The University moved for an order enjoining the NCAA from sanctioning it for failure to administer the NCAA program. The motion was denied as premature, this Court noting that the NCAA had not yet had the opportunity of being heard with respect to the constitutionality of its program.

Plaintiff moved this Court to adopt the rulings of the Superior Court and this Court declined. Plaintiff joined the NCAA as a party defendant as required after the third-party action of the University against the NCAA was dismissed.

The parties agreed to a Stipulation and Order of Partial Dismissal, entered by the Court, that the portion of the action concerning the University's drug-testing program had been compromised and settled. Plaintiff's claim against the University's drug-testing program was dismissed with prejudice. The plaintiff's claim against the NCAA's drug-testing program and the University's participation therein remains.

The NCAA's drug-testing program requires student athletes annually, prior to participation in intercollegiate competition during the academic year in question, to sign a statement in which he/she

> ... submits information related to eligibility, recruitment, financial aid, amateur status and involvement in organized gambling activities concerning intercollegiate athletics competition under the governing legislation of this Association, and *consents to be tested for the use of drugs prohibited by NCAA legislation. Failure to complete and sign the statement annually shall result in the student-athlete's ineligibility for participation in all intercollegiate athletics competition.*

(The 1987–88 NCAA Drug–Testing Program, Part II, Constitution 3–9–(i); emphasis added.) Part IV of the NCAA's program lists the classes of banned drugs and examples. "Street drugs," such as cocaine and amphetamine, are listed as are certain drugs that have been used in efforts to increase performance

> 1) by improving physiological and/or psychological capacity directly, 2) by removing psychological restraints to physiological capacity and 3) by providing a mechanical or psychological advantage. Other drugs such as diuretics are banned

because they have been used in unethical and dangerous attempts to modify body characteristics....

(Para. 4, Affidavit of Robert Dugal, Professor and Director of the Health Sciences Research Center of the National Institute for Scientific Research, Montreal, Quebec, Canada; Director of drug-testing programs for the Montreal Summer Olympic Games, 1973–1976, and the Lake Placid, NY Winter Olympic Games, 1977–1980; since 1980 and presently is a full member of the International Olympic Committee Medical Commission, the work of which he has been closely associated with since 1974. He is the author of about 150 scientific communications and publications on drug testing and related areas. (Para. 1.)

Part V of the NCAA's program, Protocol, provides at Section 1.2 that evidence of use of a banned substance shall be from analysis of the student-athlete's urine with confirmation by gas chromatography/mass spectrometry by an NCAA-certified laboratory. Provision is made for the student-athlete to declare the use of legitimate drugs (such as cold and diet medications) that may affect the tests. Student-athlete selection procedures are set forth at Sections 4.0–4.7. Depending on the championship event, the method of selecting a student-athlete for testing will be based on NCAA-approved random selection, position, position of finish, or suspicion. Specimen-collection procedures are set forth in Sections 5.0–5.5. The student athlete must among other things appear at a time certain as notified, provide adequate identification, and provide a urine sample in a beaker provided in a sealed plastic bag. The furnishing of the specimen will be monitored by observation to insure the integrity of the sample. A witness may accompany the student-athlete to the collection station to certify identification and observe processing of the forms and the specimen. Chain-of-custody provisions are set forth at Sections 6.0–6.3. Provisions for notification and additional testing of the specimens provided, with the presence of a representative or surrogate of the student-athlete present, are set forth in Sections 7.0–7.5.

Plaintiff O'Halloran now moves for a preliminary injunction against the University and the NCAA, forbidding them from barring her from competition during the pendency of this action.

## II. SHOWING NECESSARY FOR PRELIMINARY INJUNCTION

The Ninth Circuit standard for the grant of a preliminary injunction may be described as "a continuum in which the required showing of harm varies inversely with the required showing of meritoriousness." *Card v. Governing Board of Grossmont Union High School District*, 790 F.2d 1471, 1473 n. 3 (9th Cir.1986). There is also a public interest element in the question of whether Plaintiff's requested relief should be granted. *See, e.g., American Motorcyclist Ass'n v. Watt*, 714 F.2d 962, 965 (9th Cir.1983).

### A. Balance of Hardships

Plaintiff argues that since she is currently being denied the opportunity to participate on the University's indoor track team, that without the injunction she will likely lose her entire sophomore year of eligibility during the pendency of this case, that these lost months cannot be restored, and that this loss of opportunity to compete constitutes irreparable harm warranting injunctive relief.

The University argues that Plaintiff does not speak for the other 698 athletes competing for the University, but requests protection from NCAA sanctions should the Court order that Plaintiff be allowed to compete without signing the consent form.

The NCAA argues that NCAA rules do not prevent Plaintiff from participating in University sporting activities; the rules only prevent Plaintiff from competing in intercollegiate regular season and NCAA championship competition. Plaintiff may run with the team, train with the coach, and use the University's facilities. Moreover, she would only be screened if she were to qualify for post-season competition. The NCAA, however, would be harmed to a greater degree because its

effective regulation of intercollegiate athletics would be impaired. The Court would be substituting its judgment for the NCAA's, competent athletes might use banned drugs in violation of NCAA rules, and the public interest in fair competition without the use of drugs would not be served.

The balance of hardships tips in favor of the University and the NCAA. The possibility that Plaintiff may qualify to compete in intercollegiate meets or post-season competition this year does not outweigh the fairness of equal treatment owed the hundreds of other student-athletes nor the public's interest in a program for fostering drug free sports competitions and drug education. Plaintiff may still participate in her chosen sport at the University: she may practice and even set records, if she is able, and she is not precluded from pursuing a livelihood in professional track and field. She is only precluded from competing in intercollegiate meets and post-season championships should she qualify for such events.

On the other hand, if Plaintiff were allowed to compete in intercollegiate and post-season events without having to consent to NCAA drug testing, consenting student-athletes would question the fairness of this action, and the public interest in the commendable goal of deterrence of drug abuse of all types would not be served. Compared with these broader interests of other student-athletes and the public, Plaintiff's hardship is less compelling. This is particularly true in view of the defendants' greater likelihood of success on the merits, the other element of the Ninth Circuit's standard.

## B. The Merits of Plaintiff's Claims

Plaintiff contends that the NCAA's drug-testing program is constitutionally flawed because it interferes significantly with students' privacy rights: the right to live one's life in private, free from governmental interference. *Camara v. Municipal Court,* 387 U.S. 523, 528, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930 (1967); *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d

510 (1965), "the right to be let alone," *Olmstead v. United States,* 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928). Plaintiff contends that this interference occurs because urination is monitored and because private facts about the student-athlete's activities in addition to the use of drugs may be revealed; for example, pregnancy or the use of pills for birth control, treatment of depression, epilepsy, or diabetes. Such interference in the absence of individualized suspicion impermissibly burdens these privacy interests, argues Plaintiff. Plaintiff also argues that overall, the drug-testing program results in an unreasonable search and seizure because the need for the search does not outweigh the invasion of privacy rights.

Defendant NCAA argues that its enforcement of its rule requiring preseason consent to drug screening as a condition of eligibility to participate in member intercollegiate athletics is not prohibited by the Constitutions of the United States and the State of Washington and the NCAA's conduct is not "state action." The NCAA cites numerous Federal appellate court cases, applying Supreme Court standards, concluding that the rule making by the NCAA and enforcement of NCAA rules constitutes private conduct rather than state action; *Rendall–Baker v. Kohn,* 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982), *Blum v. Yaretsky,* 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982), *Arlosoroff v. NCAA,* 746 F.2d 1019, 1021–22 (4th Cir. 1984), *Graham v. NCAA,* 804 F.2d 953, 957–58 (6th Cir.1986); *Karamanos v. NCAA,* 816 F.2d 258 (6th Cir.1987).

The NCAA argues that even assuming state action is present, the screening program invades no constitutionally protected right because (1) the privacy interest alleged does not rise to the magnitude of highly personal family matters addressed in Supreme Court privacy right cases, (2) the privilege of participating in intercollegiate athletics is not a constitutionally protected property or liberty interest, and (3) there is no unreasonable search and seizure since the search is compelled neither by the Government nor by the giving up of a

privilege (intercollegiate competition) secured by the State or Federal constitution.

### 1. *State Action.*

The "state action" issue must be addressed first. Plaintiff alleges her claims of constitutional violations pursuant to 42 U.S.C. § 1983, which gives victims of such violations a private right of action. To state a claim under Section 1983, Plaintiff must establish two essential elements:

(1) whether the conduct complained of was committed by a person acting under color of state law; and (2) whether this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States.

*Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). The first question is, then, whether the participation of the University of Washington (a state institution) in the NCAA (a voluntary association of private and public institutions) and the University's enforcement of NCAA rules constitute "state action."

Early cases answered "yes" to this question based upon the principle that a certain level of involvement of state institutions in the NCAA could convert what would otherwise be private conduct into state action. Supreme Court decisions in *Rendell–Baker* and *Blum* provided a different standard yielding different conclusions. *Arlosoroff* cited nearly every early case and summarized the new rule:

These earlier cases rested upon the notion that indirect involvement of state governments could convert what otherwise would be considered private conduct into state action. That notion has now been rejected by the Supreme Court, however, and its decisions require a different conclusion.

\*    \*    \*    \*    \*    \*

Formally, the NCAA is a private entity. Approximately one-half of its members are public institutions, and those institutions provide more than one-half of the NCAA's revenues. Those facts, however, do not alter the basic character of the NCAA as a voluntary association of public and private institutions. Nor do they begin to suggest that the public

institutions, in contrast to the private institutional members, caused or procured the adoption of the Bylaw.

It is not enough that an institution is highly regulated and subsidized by a state. *If the state in its regulatory or subsidizing function does not order or cause the action complained of, and the function is not one traditionally reserved to the state, there is no state action.*

*Arlosoroff*, 746 F.2d 1019, 1021–22 (4th Cir. 1984) (emphasis added). In *Blum*, where the Supreme Court held that patient care decisions made by individual doctors at state funded nursing homes was held not to constitute "state action," the Court said that the required nexus between the state and the challenged action might be found where the state:

has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State.

*Id.* at 546. The required nexus could also be present

if the private entity has exercised powers that are "traditionally the exclusive prerogative of the state."

*Id.* at 547. Similarly, in *Rendell–Baker*, the Supreme Court determined that a remedial private school's discharge of certain employees did not constitute state action for purposes of First and Fourteenth Amendment claims. While the school relied upon public funds for the education of referred students and performed public contracts for the benefit of the Government, the important point was that the school's decisions "were not compelled or even influenced by any state regulation." 457 U.S. at 841, 102 S.Ct. at 2771, 73 L.Ed. 2d at 428.

Federal courts since *Blum* and *Rendell–Baker* have held that rule making by the NCAA and enforcement of NCAA rules constitute private conduct rather than state action. *See, e.g., Karamanos* and *Graham*, and, more recently, *Barbay v. NCAA*, No. 86–5697 (E.D.La. Jan. 15, 1987) [Available on WESTLAW, 1987 WL 5619]

concerning the drug screening eligibility rule. No different conclusion is warranted here.

■ Plaintiff has not met the requirement of 42 U.S.C. Section 1983 of demonstrating that the conduct complained of, enforcement of the NCAA's drug-testing program, is commited by persons acting under color of state law: (1) there is no showing that the State of Washington has exercised coercive power or provided significant encouragement, overtly or covertly, such that either the promulgation or enforcement of the drug-screening rule must be deemed to be state action; and (2) neither is there a showing that the regulation of intercollegiate athletics is a traditionally exclusive prerogative of the state.

### 2. Constitutional Rights.

Not only has Plaintiff failed to state the first element of her Section 1983 claim—without which the claim fails—she has failed as well to demonstrate the second element: that the conduct complained of deprived her of a right, privilege, or immunity secured to her by the Constitution or laws of the United States.

Plaintiff argues that the drug-testing procedure constitutes an unconstitutional invasion of her privacy and an unreasonable search and seizure.

#### a. The Fourth Amendment

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures...." These rights are implicated only if the conduct at issue infringes "an expectation of privacy that society is prepared to consider reasonable." *O'Connor v. Ortega,* —— U.S. ——, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987).

■ The issue that must first be considered is whether a student-athlete has a reasonable expectation of privacy in the personal information contained in bodily fluids, specifically urine. To determine this, the question is first, whether a urine test constitutes a "search" for purposes of the Fourth Amendment, and second, if a

"search," whether a reasonable expectation of privacy is infringed. The conclusion reached in this case is that while a urine test may be a "search," it is reasonable, there being a diminished expectation of privacy in the context of a university athletic program and there being a compelling interest by the University and the NCAA that outweighs the relatively small compromise of privacy under the circumstances.

The Supreme Court has held that blood tests are searches within the meaning of the Fourth Amendment, *Schmerber v. California,* 384 U.S. 757, 767, 86 S.Ct. 1826, 1834, 16 L.Ed.2d 908 (1966), and numerous Federal circuit courts and district courts have held that urine tests are also searches for Fourth Amendment purposes. *See, e.g., Everett v. Napper,* 833 F.2d 1507, 1509 (11th Cir.1987), and other cases listed in *Railway Labor Executives' Ass'n v. Burnley,* 839 F.2d 575, 579 (9th Cir.1988).

■ Pursuant to the foregoing authorities, the NCAA's urine testing program is a search for Fourth Amendment analysis.

The next question is what standard is applied to determine what constitutes a reasonable search. "What is reasonable depends on the context within which a search takes place." *O'Connor,* 107 S.Ct. at 1499.

While a search pursuant to a warrant issued with "probable cause" is reasonable, a warrant "is not the *sine qua non* of reasonableness. *Railway Labor Executives' Ass'n,* at 582. There are certain well-defined exceptions to the warrant requirement such as: searches incident to lawful arrest, the "automobile exception," hot pursuit, plain view, border searches, administrative searches of closely regulated industries, inventory searches, searches of school-children's possessions at school, and consent. *Id.* at 583, 584 and cases cited.

The *Railway Labor* case concerned the constitutionality of Federal Railroad Administration (FRA) regulations mandating blood and urine tests of employees after certain train accidents and fatal incidents,

and authorizing breath and urine tests after certain accidents, incidents, and rule violations. The Ninth Circuit held that while a warrant was not required for such testing, the case did not fit any of the classes of cases listed above that constituted exceptions for the warrant requirement. The Court reasoned that the exceptions involved searches of property not persons, and that while the railroads are heavily regulated industries, the employees' expectation of privacy in their bodily fluids are not diminished because of that regulation. The Court distinguished *Shoemaker v. Handel,* 795 F.2d 1136, 1142 (3d Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 577, 93 L.Ed.2d 580 (1986), which held the administrative search exception applies to warrantless breath and urine testing of jockeys in the heavily regulated horse-racing industry, because the jockeys were the principal regulatory concern:

> The regulation of horse racing in New Jersey is designed to protect the wagering public and its confidence in the integrity of the racetrack employees through licensing provisions and restrictions on employing persons convicted of a crime involving moral turpitude. *Id.* at 1141–42. In contrast, the extensive regulation of the railroad industry is designed to guarantee the safety of employees and the public and to that end has always been geared to assuring the safety and proper maintenance of equipment and facilities. Railroad employees are not licensed, nor is their employment conditioned upon the absence of a prior criminal record.

*Railway Labor* at 585. In summary, the Ninth Circuit held that

> the administrative inspection standard, which allows warrantless searches of the premises of pervasively regulated industries, is not applicable to searches of persons even when they are employed in those industries, unless the employees are the principal concern of the industry regulation.

*Id.* at 585.

The case at bar is distinguishable from the *Railway Labor* case because the NCAA rules have as their principal concern the student-athlete. The prefatory statements (quoted *infra*) from *The 1987–88 NCAA Drug–Testing Program* demonstrate that of primary importance is the health and safety of the student-athlete and the ideal of fair and equitable competitions. As in *Shoemaker,* the jockey regulation case, there is also a public interest element; here it is the integrity of athletic competitions.

The *Railway Labor* Court went on to distinguish those cases approving searches of persons without probable cause or individualized suspicion: *United States v. Martinez–Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976) (upheld brief vehicle stops at fixed checkpoints to question occupants without individual suspicion), *United States v. Des Jardins,* 747 F.2d 499, at 505–06 (9th Cir.1984) (upheld pat-down search of person at border based only on minimal showing of suspicion), *partially vacated,* 772 F.2d 578 (9th Cir.1985); *McMorris v. Alioto,* 567 F.2d 897 (9th Cir. 1978) (approved routine metal detector and pat-down searches of attorneys entering courthouse); *United States v. Davis,* 482 F.2d 893, 910–11 (9th Cir.1973) (approved preboarding searches of airline passengers). The Court reasoned:

> Stops for questioning, pat-down searches and magnetometer searches do not approach the degree of intrusiveness involved in toxicological testing of body fluids. The consistent rationale of the cases is that a vital governmental interest in, for example, national self-protection, ... the safety of judicial officers, ... or in combatting terrorism and hijacking ... may justify a minimal intrusion. We do not consider breath, blood or urine testing to be similarly minimal intrusions.

*Railway Labor* at 586. The Court then went on to analyze the reasonableness of the search pursuant to the FRA regulations.

To determine the reasonableness of a search, a court is required to "balance the nature and quality of the intrusion on the individual's Fourth Amendment interests

against the importance of the governmental interests alleged to justify the intrusion." *O'Connor v. Ortega*, — U.S. —, 107 S.Ct. 1492, 1499, 94 L.Ed.2d 714 1987). This reasonableness inquiry also requires consideration of the basis for believing wrongdoing will be revealed by the search and that the scope of the search is reasonable. *Id.* 107 S.Ct. at 1503.

In *Railway Labor,* the Court balanced what it concluded were the railroad employees' "reasonable expectations of privacy" with "the governmental interest in the safe and efficient operation of the railroads for the benefit of railroad employees and the public affected by that operation." *Railway Labor* at 586. The Court stated

> We believe that accommodation of railroad employees' privacy interest with the significant safety concerns of the government does not require adherence to a probable cause requirement.

*Id.* at 587. If the standard is not "probable cause," the *Railway Labor* Court still had to determine what it was. The Court continued that to be reasonable, a search must satisfy the two-prong test of *New Jersey v. T.L.O.,* 469 U.S. 325, 337, 105 S.Ct. 733, 740, 83 L.Ed.2d 720 (1985): (1) whether the search was justified at its inception, and (2) whether the search as conducted was reasonably related in scope to the circumstances which justified the interference in the first place. *Id.* at 341, 105 S.Ct. at 742.

In *O'Connor,* the *Railway Labor* Court explains, whether a search was justified at its inception meant whether there were reasonable grounds for suspecting the search of an employee's office would turn up evidence that he was guilty of work-related misconduct. *Id.* at 587. The Ninth Circuit noted, citing *O'Connor,* 107 S.Ct. at 1503, that the Supreme Court has not determined whether "reasonable grounds for suspecting" necessarily means that there must be individualized or particularized suspicion. The *Railway Labor* Court concluded:

> We hold that particularized suspicion is essential to finding toxicological testing of railroad employees justified at its inception. Accidents, incidents or rule violations, by themselves, do not create reasonable grounds for suspecting that tests will demonstrate alcohol or drug impairment in any one railroad employee, much less an entire train crew.

*Id.* at 587.

Regardless of how a court may balance the potential for catastrophe with a drug- or alcohol-impaired engineer of a passenger train compared with the problems that could occur at a racetrack with a jockey who uses drugs, the circumstances to be analyzed in the case at bar are different from either *Railway Labor* or *Shoemaker.* Determining the reasonableness of the NCAA's drug-testing program means one must consider the two-fold inquiry set forth in *O'Connor,* 107 S.Ct. at 1503, and *T.L.O.,* 469 U.S. at 337, 105 S.Ct. at 740. First, was the action justified at its inception, that is, are there reasonable grounds for believing that urine tests of student-athletes will turn up evidence of misconduct—inapproirpate drug use? The NCAA's grounds for suspicion are past incidents of improper drug use by athletes. The news media has widely publicized such incidents, and the affidavit of Dr. Dugal (discussed *infra* ) summarizes the concerns that led to the adoption of a drug-testing program by the Olympic Games Committee. Thus, the suspicion is not directed at a particular individual but at an activity that has experienced a drug-abuse problem. It is laudable that the NCAA and its member institutions are attempting to educate, ferret out, and deter drug abuse among student-athletes; indeed, they would be remiss in the eyes of the public and parents if they did not make such an effort. There is, therefore, a reasonable basis for believing that urine testing will turn up evidence of inappropriate drug use by student-athletes. It should be observed additionally, that such testing as part of the program will have a deterrent effect, and that over time less evidence will be found. Such evidence of the program's success should not be used to demonstrate lack of need for the program or that the program has no reasonable basis.

Second, the scope of the program is fully tailored to address the need. The rationale for the time, place, manner, and type of testing is discussed fully in Dr. Dugal's affidavit, and the court will not substitute its judgment for the expertise of those who developed the NCAA testing program.

Thus, the Court concludes that both the basis for and the scope of the NCAA's drug-testing program is reasonable, but it must also address the competing interests involved to complete the determination of reasonableness under all the circumstances. The question is, then, while there may be a reasonable suspicion that student-athletes may misuse a variety of drugs, are student-athletes' constitutional rights being impermissibly invaded by the drug-testing program, or does the interest in such testing outweigh the incursion? The Court concludes that the expectation of privacy alleged is diminished in an athletic program (see discussion, *infra,* part b.) and that the relative encroachment is outweighed by the greater interests in health of the student-athletes and fair competitions. These interests will be weighed in the analysis concerning Plaintiff's allegations of invasion of her privacy rights.

b. Privacy Interests.

Plaintiff's greatest complaint of an invasion of privacy concerns the testing program's requirement of monitored urination. Monitored urination to help to assure the integrity of both the urine sample and the drug-testing program is a relatively small intrusion in the context of a university's athletic program. First, a university athletic program concerns education relating to health and physical fitness as well as learning skills in the various sports offered. There is an element of communal undress that is not present in other university contexts. Communal undress was not an element discussed in *Railway Labor* or even *Shoemaker.* The health of participants in vigorous sports activities is of primary importance to a university and the student athlete, so it follows that health examinations should be fairly routine. Certainly in the context of health examinations, viewing and touching is tolerated

among relative strangers that would be firmly rejected, to say the least, in other contexts. While provision of a urine sample is not extraordinary in an ordinary health examination, witnessing the act is. Nevertheless, in the context of a university's athletic program where student health is a primary interest, monitored urination to preserve the integrity of the urine sample taken as part of an announced testing program to foster education and deterrence of drug misuse and abuse does not constitute an unreasonable invasion of privacy.

Plaintiff's concern that the tests will reveal other private information about those tested is not well taken. There are precise procedures for notification of specific officials when there is a positive result confirmed by additional testing. (Section 7.0, *et seq.,* of *The 1987–88 NCAA Drug–Testing Program.*) Only then is the code number on a particular specimen broken. There is no provision for either detecting or revealing other information contained in the specimen. The Program's concern is directed only at the listed banned substances.

In providing the urine sample, the student-athlete is not threatened with the consequences of loss of liberty that may face one who is the subject of a criminal investigation. The only consequence facing a student-athlete who tests positive (after subsequent testing confirming positive results) is denial of intercollegiate eligibility, which is not protected by the State or Federal constitution.

Neither does this denial of intercollegiate eligibility constitute coerced consent to the testing. There has been no showing that withholding of eligibility for intercollegiate competitions is something that a university or the NCAA may not do under any circumstances. Certainly low grades, failure to use protective athletic equipment, or medical reasons could result in the withdrawal of such eligibility. *See, Bally v. Northeastern University,* No. 87–1178 (Mass.Super.1987). Plaintiff concedes that participation in intercollegiate athletics is not a constitutionally protected activity. While the student-athlete may sacrifice some pri-

vacy during the times specimens are gathered during the period of the NCAA championships, the interest in testing is great and benefits redound to the student-athletes as well when competitions are fair, peer pressure and temptations to use drugs are reduced, and their health is protected.

Bearing this degree of intrusion in mind, the countervailing interest must be examined. The Preface to *The 1987–88 NCAA Drug–Testing Program* sets forth the interest of the NCAA and member institutions who:

... reaffirmed their dedication to the ideal of fair and equitable competition at their championships and postseason certified events. At the same time, they took another step in the protection of the health and safety of the student-athletes therein competing. So that no one participant might have an artificially induced advantage, so that no one participant might be pressured to use chemical substances in order to remain competitive and to safeguard the health and safety of participants, this NCAA drug-testing program has been created.

The affidavit of Robert Dugal (quoted earlier herein) (who is a professor with undergraduate degrees in Scientific Humanities/Biochemistry and Pharmaceutical Sciences, a masters degree in Pharmaceutical Physical Chemistry, and a doctorate degree in Pharmacology, and who is, as stated earlier, also a member of the International Olympic Committee Medical Commission since 1980 and has served as director of the drug-testing program for the Olympic Games on two occasions) provides information concerning the need for a drug-testing program as well as information about the various classes of drugs that are banned under the NCAA program. Robert Dugal's affidavit (attached as Exhibit D to the affidavit of Don Paul Badgley in Opposition to the Motion for Preliminary Injunction filed August 21, 1987) is comprehensive and compelling in light of his experience. Professor Dugal states that the classes of drugs banned are "misused or abused in sport primarily for the purpose of improving performance," (Dugal affidavit, p. 2, para. 3) and that "[i]n addition, all

the drugs which are banned provoke adverse effects and untoward reactions which may be detrimental to a student-athlete's present and future health." *Id.* Professor Dugal also observes that

... the profile and popularity of collegiate sport is such that revelations of drug misuse by athletes at the higher levels of competition have an immediate adverse effect on the entire sport community and society at large. The health of athletes is threatened; public perception about sport excellence is endangered; younger athletes aspiring to high achievement in sport come to believe (and sometimes are led to believe) that they too must use such drugs if they are to succeed; and a great many athletes come to regard their fellow competitors not as colleagues engaged in fair competition, but rather as objects of suspicion about whom allegations and counter-allegations of drug use are made.

*Id.*, p. 3, para. 6. Professor Dugal explains that the need for drug-testing programs was also demonstrated "in the 50's and early 60's, [when] a number of deaths and major accidents directly attributable to the use and abuse of drugs taken for the purpose of improving performance (especially amphetamines) were revealed." *Id.*, p. 4, para. 7. Drug testing, viewed as a deterrent, was implemented as part of an educational program at the 1968 Olympic Games and has continued since then at every major international event. *Id.* Professor Dugal goes on to discuss the various categories of banned drugs, such as anabolic steroids, stimulants, and diuretics, as well as "related compounds," a necessary category owing to the rapid development of "designer drugs," which are chemically related to the examples of listed substances. *Id.*, p. 9, para. 9.

Professor Dugal states that "It has been my personal experience that a testing program contributes significantly to decrease drug misuse in sports." *Id.*, p. 6, para. 12. He then outlines the frequency of detected use.

Concerning testing as the best alternative, Professor Dugal states that there is a

"practical impossibility of detecting by observation alone the use of anabolic steroids, depressants and even stimulants in most cases." *Id.*, p. 12, para. 22.

Professor Dugal also addresses the matters of who to test, when to test, and how to test in examining the NCAA program in light of the Olympic Committee's experiences. *Id.*, p. 12 ff.

Against this background, the larger interests of the health of the student-athlete as well as the public's and the competing athletes' perception of the fairness of intercollegiate athletics greatly outweighs the relatively small compromise of an individual's privacy interest, which is diminished in the context of collegiate athletics.

## CONCLUSION

■ Plaintiff has not demonstrated that the balance of hardships tips in her favor; indeed, the balance tips in favor of the University and the NCAA. Plaintiff has failed to demonstrate that she is likely to succeed on the merits in that she has failed to demonstrate that the drug testing complained of is the product of "state action." Moreover, Plaintiff has not demonstrated that there has been an invasion of any constitutionally protected right requiring invalidation the drug-testing program. The invasion of her privacy interest by the specimen collection procedures of the drug-testing program are outweighed by the compelling interest of the University and the NCAA in protecting the health of student-athletes, reducing peer pressure and temptations to use drugs, ensuring fair competitions for the student-athletes and the public, and educating about and deterring drug abuse in sports competition.

Accordingly, Plaintiff's Motion for Preliminary Injunction is DENIED.