Vincent DIMEO, et al., Plaintiffs,

v.

Farrel J. GRIFFIN, et al., Defendants.

No. 88 C 1503.

United States District Court,
N.D. Illinois, E.D.

Aug. 25, 1989.

Harvey Grossman, Alan K. Chen, Roger Baldwin Foundation of ACLU, Inc., Steven R. Gilford, Scott J. Frankel, Mayer, Brown & Platt, Chicago, Ill., for plaintiffs.

Neil F. Hartigan, Thomas A. Ioppolo, Asst. Attys. Gen., Chicago, Ill., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SHADUR, District Judge.

Vincent Dimeo ("Dimeo"), James Kinnard ("Kinnard"), William Knott ("Knott"), Brent Bullard ("Bullard") and James Curran ("Curran") have brought this class action [1] against the nine members of the Illinois Racing Board ("Board"),[2] charging that various provisions of Board's Substance Abuse Rule (the "Rule")[3] violate the Fourth Amendment's prohibition against unreasonable searches and seizures.[4] On February 25, 1988 this Court conducted an evidentiary hearing on Plaintiffs' Emergency Motion for Temporary Restraining Order and Preliminary Injunction. Based on that hearing this Court issued a temporary restraining order ("TRO") that, among other things, enjoined defendants from conducting random urine

---

**1.** Plaintiffs sue on behalf of themselves and all Board-approved occupation licensees in several positions: Driver, Jockey, Starter, Assistant Starter and Outrider or Parade Marshal (collectively "Class Plaintiffs").

**2.** Under the Horse Racing Act of 1975 ("Act"), Ill.Rev.Stat. ch. 8, ¶¶ 37–1 to 37–53, Board comprises nine members appointed by the Governor with the advice and consent of the Senate (no more than five members may be of the same political party) (*id.* ¶ 37–4). All further citations to the Act will take the form "Act ¶ —," referring to its Chapter 8 numbering rather than to its internal section numbering. All Board members are sued solely in their official capacities.

**3.** Illinois Register Tit. 11, §§ 508.10–508.90 contain the Rule's provisions. All further references to the Rule will take the form "Rule § —," omitting the Title 11 citation.

**4.** Of course state actor defendants such as Board are bound by the Fourteenth Amendment rather than the Fourth. This opinion will, however, follow the conventional (though technically imprecise) usage of referring directly to the Bill of Rights provision rather than to the Due Process Clause, which has been held to incorporate that provision.

tests or any other urine tests without specific articulable facts that meet an objective standard of probable cause.[5] By agreement of the parties the TRO was extended beyond the ten-day period prescribed by Fed.R.Civ.P. ("Rule") 65(b) and remains in effect pending disposition of the motion for a preliminary injunction.

Both sides have (at long last) submitted proposed findings of fact and conclusions of law as well as extensive evidentiary submissions bearing on the propriety of a preliminary injunction to supplant the TRO. This Court now finds the facts specially and states its conclusions of law, as required by Rule 52(a), in the following Findings of Fact ("Findings") and Conclusions of Law ("Conclusions").[6]

## FINDINGS OF FACT

*Board's Authority Under the Act*

1. Act ¶ 37-15(a) authorizes Board to issue, in its discretion, occupational licenses to persons "whose work, in whole or in part, is conducted upon race track grounds within the State which are owned by race track organizations."

2. Board may refuse a license to any person (Act ¶ 37-15(c), quoted verbatim):

(1) who has been convicted of a crime;

(2) who is unqualified to perform the duties required of such applicant;

(3) who fails to disclose or states falsely any information called for in the application;

(4) who has been found guilty of a violation of this Act or of the rules and regulations of the Board; or

(5) whose license or permit has been suspended, revoked or denied for just cause in any other state.

3. Board may suspend or revoke a license (Act ¶ 37-15(d), quoted verbatim):

(1) for violation of any provisions of this Act; or

(2) for violation of any of the rules or regulations of the Board; or

(3) for any cause which, if known to the Board, would have justified the Board in refusing to issue such occupation license; or

(4) for any other just cause.

4. Act ¶ 37-9(b) vests Board:

with the full power to promulgate reasonable rules and regulations for the purpose of administering the provisions of this Act and to prescribe reasonable rules, regulations and conditions under which all horse race meetings in the State shall be held and conducted. Such reasonable rules and regulations are to provide for the prevention of practices detrimental to the public interest and for the best interests of horse racing and to impose penalties for violations thereof.

5. Board "may eject or exclude from any race meeting or organization grounds or any part thereof, any occupation licensee whose conduct or reputation is such that his presence on organization grounds may, in the opinion of the Board, call into question the honesty and integrity of horse racing or interfere with the orderly conduct of horse racing" (Act ¶ 37-9(e)). "Race meeting" is defined as (Act ¶ 37-3.07):

the whole period of time, whether consecutive dates or those instances where nonconsecutive dates are granted for which an organization license to race has been granted to any one organization by the Board.

6. Board may impose civil penalties of up to $5,000 against individuals and up to $10,000 against organizations for violations of the Act, for violations of Board rules or orders, or for "any other action which, in the Board's discretion, is a detriment or impediment to horse racing" (Act ¶ 37-9(*l*)).

7. Pursuant to its authority granted by the Act, Board promulgated the Rule as

---

**5.** On March 16, 1988 this Court entered the written TRO reflecting its already-issued oral order.

**6.** To the extent (if any) the following Findings may be deemed conclusions of law, they shall also be considered Conclusions. To the extent (if any) matters later expressed as Conclusions may be deemed findings of fact, they shall also be considered Findings.

well as the Guidelines for the Implementation of the Illinois Racing Board Substance Abuse Rule ("Guidelines").[7]

*Relevant Rule and Guideline Provisions*

8. Rule § 508.10(b) asserts the Rule's purpose is:

> to prevent practices in horse racing that are detrimental to the public interest, to promote the best interests of horse racing, and to cooperate in the establishment of a national substance abuse rule for racing as proposed by the National Association of State Racing Commissions.

9. Board has a twofold stated concern with drug use in the racing industry (Rule § 508.10(c), quoted verbatim):

> 1) the impact on an individuals ability to perform his duties; and

> 2) the addiction which may make the individual peculiarly susceptible to bribes or other improper influences.

10. Rule §§ 508.30–508.40 outline the procedures for testing for alcohol. Class Plaintiffs do not challenge those aspects of the Rule.

11. Rule § 508.50(a) prohibits the "use on the grounds of any race track [of] any Controlled Substance or any prescription drug unless such substance was obtained directly, or pursuant to a valid prescription or order from a licensed physician." That prohibition applies specifically to Jockeys, Drivers, Starters, Assistant Starters and Outriders [8] (*id.;* Guidelines § II).

12. To implement that provision, Rule §§ 508.50 and 508.80 provide for two kinds of urine testing: testing based on individualized suspicion and testing at random (see also Guidelines § II). Because random testing is obviously more problematic in constitutional terms, it will be considered first.

*Random Testing*

13. Board determines the volume and frequency of random testing at each race meet, as well as which selected racing programs are subject to testing (Guidelines at 2).

14. Random testing begins by placing the names of all Class Plaintiffs who appear as participants on the official program in a locked container secured by the race stewards (*id.*).

15. Next a steward draws up to five names from the container, with a representative of the Jockey's Guild ("Guild"), the Illinois Horsemen's Benevolent and Protective Association or the Illinois Harness Horsemen's Association having been invited to witness the selection process (*id.;* Rule § 508.80(c)).

16. Then the stewards locate and notify the individuals selected for random testing. Each individual selected must report to the designated sample collection area and provide a urine sample to the stewards or their designee before the last race on that day's racing program (Guidelines at 2; Rule § 508.80(d)).

17. No licensee is required to provide a sample more than three times in a race meet (Guidelines at 2; Rule § 508.80(e)). Board has also now agreed (though this appears nowhere in the Rules or Guidelines) that a licensee will not be randomly tested more than five times per year (D.R. Mem. 9). If a name is drawn more than three times in any meeting (or presumably more than five times in any year) the stewards will disregard the selection, return the name to the container and draw another name (Guidelines at 2–3; Rule § 508.80(e)). To implement that limitation the stewards must maintain a confidential log of all licensees selected for random testing (Guidelines at 3).

7. Board has revised the Guidelines several times. When this action was begun the January 25, 1988 version (P.Ex. 2) was in effect. On March 14, 1988 the current and prospectively applicable Guidelines (P.Ex. 3) were published. These Findings and Conclusions will refer to the current Guidelines. Because every relevant Guidelines provision is part of its "Section II: Implementation," reference will be made only to the page citation, omitting any Section designation.

8. In harness racing the Outrider is called a Parade Marshal. More on this later.

*Individualized–Suspicion Testing*

18. Any licensee subject to testing based on individualized suspicion will receive written notice from the stewards stating he or she will be tested and the reason for such testing (Guidelines at 3).

19. Individualized-suspicion testing must be based on a finding that the licensee is under the influence of drugs. On that score Guidelines at 3 provide (quoted verbatim):

> Such a finding by the stewards shall be based upon corroborated evidence or observable phenomena, such as direct observation of drug use or possession and/or physical symptoms of being under the influence of alcohol or drugs such as erratic behavior. These are examples of conduct which would satisfy individualized suspicion standards, however, this list is non-inclusive.

*Urine Collection and Testing Procedures*

20. Any licensee selected for urine testing (either random or individualized-suspicion) must present himself or herself to the designated collection site, which is secured by Board representatives: No unauthorized personnel are permitted in any part of the site where urine specimens are collected or stored (Guidelines at 4).

21. Before providing the sample the licensee must present personal identification. As for the sample itself, it may be provided in the privacy of a stall or other partitioned area that allows for individual privacy. Before entering the stall the licensee must remove all unnecessary outer garments and leave personal belongings outside. Bluing agents are added to the toilet water to prevent adulteration (Guidelines at 4).

22. Upon receiving the specimen from the licensee, the Board representative determines whether it contains a minimum of 50 milliliters of urine (one-half of the bottle). If not, the licensee may return later in the day (but before the last race) to provide a sufficient sample. If unable to provide a sample on the day selected, the licensee may be requested to return the next day (Guidelines at 4).

23. Once the Board representative receives the specimen he or she must check for signs of tampering (such as obvious temperature or color difference). Then the representative separates the specimen into two parts, a "laboratory" sample and a "referee" sample. Only the laboratory sample is tested initially (Guidelines at 6; Rule § 508.50(d)).

24. Both specimen bottles are then sealed and tagged. Board maintains stringent procedures for assuring the chain of custody of the sample, and the licensee is required to verify that he or she has witnessed the identification, splitting and sealing procedures by signing a form provided by Board (Guidelines at 5–6; Rule § 508.50(c)). All sealed urine specimens are kept in a locked refrigerator pending pickup by the laboratory (Guidelines at 7).

25. After analyzing the "laboratory" sample for possible adulteration, the laboratory screens the urine using an immunoassay test that meets FDA requirements for commercial distribution (Guidelines at 8). Immunoassay testing uses antibodies to detect the presence of similar drugs and their metabolites in the urine (*id.*). In this instance the test screens for "Controlled Substances," defined as any substance listed in 21 U.S.C. § 812 (not including later amendments to that statute) (Rule §§ 508.-20, 508.50(a)).

26. When the concentration level of any of the following substances meets the indicated cut-off level, the test is considered "positive" (Guidelines at 8):

| | |
|---|---|
| Marijuana metabolites | 100 ng/ml [9] |
| Cocaine metabolites | 300 ng/ml |
| Opiates | 300 ng/ml |
| Amphetamines | 1,000 ng/ml |
| Barbituates | 300 ng/ml |

Except for marijuana metabolites, those test levels are subject to change as advances in technology permit identification and quantification at lower concentrations (*id.*) As for marijuana metabolites, the level is set at 100 ng/ml to reduce the chance that a licensee exposed to passive

---

9. Nanograms per milliliter.

inhalation will produce a "positive" reading (*id.*).

27. If the initial screening reflects any positive reading, a Gas Chromatography/Mass Spectrometry ("GCMS") test is used to confirm the results. GCMS isolates an individual drug or metabolite and identifies it by a characteristic fragmentation pattern similar to a fingerprint (*id.*).

28. If the GCMS test confirms the sample as positive, both the resealed laboratory sample and the unsealed referee sample are retained by the laboratory in long-term frozen storage for at least one year (Guidelines at 10). If the test yields a negative result, both the laboratory and referee samples are kept in refrigerated storage for seven days and then destroyed (*id.*).

29. Any laboratory selected by Board for testing must have a comprehensive quality assurance program and must also participate in certification and accreditation programs. Board will also employ a Drug Testing Assurance Program to monitor the laboratory's performance through the use of blind quality controls (*id.*).

30. All test results are treated as confidential. They may be used solely with respect to a ruling issued pursuant to the Rule or in any administrative or judicial hearing regarding such a ruling. All such information is exempt from public disclosure under the Illinois Freedom of Information Act (Guidelines at 12).

*Penalties*

31. In determining the appropriate penalty, Board must consider the offender's history of Rule violations, age, experience and potential of the conduct for physical harm to human and equine participants at the race meeting (Rule § 508.60(a)). Increasing penalties are provided for each new positive test (Rule §§ 508.60(a)–(c); Guidelines at 13–14):

(a) For the first violation, the licensee is to be suspended or assessed a civil penalty of up to $1,000.

(b) For a second violation, Board must suspend the licensee pending completion of a substance abuse treatment program licensed by the Illinois Department of Alcoholism and Substance Abuse or a state-licensed treatment program in another state. Upon completion of the program the licensee is subject to follow-up urine testing for one year (there is a limit of four tests in a year). Follow-up urine testing is a condition of re-licensure. Any individual suspended for a second violation is entitled to a hearing.

(c) For a third violation, the offender's license must be revoked. If an individual's license is revoked, he or she is entitled to a hearing.

32. Any licensee who fails to submit to a urine test when requested to do so must be suspended (Rule § 508.50(b)).

*Challenge to a Positive Test Result*

33. It is the licensee's responsibility to give advance written notice that he or she is permissibly using a Controlled Substance or prescription drug (Rule § 508.50(a)).

34. Any person contesting the results of a positive test may request a hearing before Board. In addition, the licensee may have the referee specimen tested at a laboratory of his or her choice (Guidelines at 14).

*Individual Plaintiffs and Their Duties*

35. Dimeo has been a Board licensee for approximately 28 years. During that entire period he has worked as an Outrider in thoroughbred racing. He has also worked as a Parade Marshal in harness racing for the past 13 years (P.Ex. 4 ¶ 1).

36. Outriders (who work exclusively in thoroughbred racing) and Parade Marshals (who work exclusively in harness racing) perform the same duties (P.Ex. 4 ¶ 5). Neither category of employees is required to submit to physical examinations as a condition of employment (*id.* ¶ 6). Outriders and Parade Marshals do not perform duties that can affect the outcome of a race (*id.* ¶ 16).

37. Dimeo works on horseback, leading the horses in the race out of the paddock area, past the reviewing stands and into the starting gate area. He is charged with ensuring that the horses parade in an orderly fashion and without incident (P.Ex. 4 ¶ 2). If a horse gets loose during the

warmup period before a race, Dimeo is responsible for retrieving the loose horse. That happens occasionally (*id.* ¶ 3).

38. Kinnard has been a licensee for close to 40 years—the past 20 years as a thoroughbred racing Starter and the preceding 20 years as an Assistant Starter (P.Ex. 5 ¶ 1).

39. As a Starter Kinnard's primary responsibilities are to ensure that horses are properly loaded into the starting gate, to observe their behavior to ensure a fair start, to check horses for proper position and then to release the starting gate to begin the race (P.Ex. 5 ¶¶ 4–5). Kinnard oversees a team of seven Assistant Starters who assist him in ensuring a fair start (*id.* ¶ 6). When the race is about to start Kinnard is positioned on a platform about six feet off the ground and in front of the starting gate on the infield side of the track (*id.* ¶ 4).

40. Starters are also not required to submit to physical examinations as a condition of employment (*id.* ¶ 14).

41. Knott has been a licensee for eight years, serving during that entire period as an Assistant Starter in thoroughbred racing. Kinnard is Knott's current supervisor (P.Ex. 6 ¶¶ 1, 3).

42. Knott's primary responsibility as an Assistant Starter is to lead horses into the starting gate and maintain control of them to ensure a proper start. Once in the gate he makes sure the horse's head is facing straight ahead. When the gate opens he turns the horse loose and raises his hand into the air (P.Ex. 6 ¶¶ 4–5). During the start Knott is standing on a built-in ledge in the starting gate (a "pontoon") (*id.* ¶ 5).

43. As a monitoring device to verify that there has been a fair start, the entire starting process is videotaped (P.Ex. 6 ¶ 5).

44. Assistant Starters too are not required to submit to physical examinations as a condition of employment (P.Ex. 6 ¶ 9).

45. Holland was a licensee in 1978 and has been a licensee for three of the past four years. He has been a Jockey in a number of states for 11 years (P.Ex. 7 ¶¶ 1–2).

46. Holland's primary responsibility is to ride thoroughbred horses in races (P.Ex. 7 ¶ 3).

47. Board asserts a formal rule requires Jockeys to submit to physical examinations as a condition of licensure (Bissett Decl. ¶ 5).[10] Holland has never been required to submit to such an exam in Illinois (P.Ex. 7 ¶ 10).

48. Guild has 40 permanently disabled members (Giovanni Dep. 8). In 1987 over 100 Guild members suffered injuries in racing in the United States severe enough to cause at least one week of disability (P.Ex. 7 ¶¶ 16–17). Nationally about two Jockeys per year die in racing accidents (Giovanni Dep. 51–52).

49. Curran has been a licensee for 21 years and has been a Driver in harness races since 1967 (P.Ex. 8 ¶ 1).

50. During a race Curran rides in a sulky—a two-wheeled metal and wood cart weighing about 45 pounds (P.Ex. 8 ¶ 7).

51. Board also asserts a formal rule requires Drivers to submit to physical examinations as a condition of licensure (Bissett Decl. ¶ 5),[11] but Curran has never been required to submit to a physical exam in Illinois (P.Ex. 8 ¶ 8).

*General Effects of Substance Use and Urine Testing*

52. All of the substances tested for under the Rule can cause impairment in humans for a period of time after use. Of course the extent of any such impairment depends on a number of factors, including the amount of the drug ingested.

53. Urine testing does not determine whether the licensee was impaired at the time the urine specimen was provided. Urine tests indicate only whether the metabolites of a drug are present in the system (P.Ex. 13 Part I at 74–75, P.Ex. 15 Part II at 33).

---

**10.** No citation to such a rule was, however, provided to this Court.

**11.** Again no citation was provided to this Court.

54. What a positive urine test shows is that the licensee has ingested or been exposed to a particular drug at some time in the past. It does not reveal how much of the substance was ingested, when it was ingested or what its effect was on the licensee when ingested (P.Ex. 15 Part I at 42–44; DuPont Dep. 55).

## CONCLUSIONS OF LAW

1. This Court has subject matter jurisdiction of this action under 28 U.S.C. §§ 1331 and 1343.

2. This Court's exercise of discretion in reviewing the request for a preliminary injunction is guided by the five factors identified in *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 386–88 (7th Cir.1984) and regularly repeated by our Court of Appeals and by District Courts in this Circuit. Because it is quite obvious the key issue here is plaintiffs' likelihood of success on the merits, these Conclusions start with that issue.[12]

*Likelihood of Success on the Merits: Random Testing*

■ 3. Two recent Supreme Court opinions directly address the constitutionality of government-imposed drug testing: *National Treasury Employees Union v. Von Raab*, — U.S. —, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989) and *Skinner v. Railway Labor Executives' Association*, — U.S. —, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989). Neither of those cases involved random drug testing (and both sides agree on that: D.R.Mem. 1 and P.R.Mem. 18). All the same, general constitutional principles that impact on this action emerge from those cases:

(a) Government-compelled urinalysis is a "search" subject to Fourth Amendment restrictions (*Von Raab*, 109 S.Ct. at 1390; *Skinner*, 109 S.Ct. at 1412–13).

(b) As a general rule, a search must be supported by a warrant issued upon probable cause (*Von Raab*, 109 S.Ct. at 1390).

(c) Nevertheless, neither a warrant nor probable cause nor any measure of individualized suspicion is constitutionally required in *every* instance (*id.; Skinner*, 109 S.Ct. at 1417).

■ 4. No documented drug problem actually existing within the workplace is an absolute precondition to the adoption of a testing program (see *Von Raab*, 109 S.Ct. at 1395 ("The mere circumstance that all but a few of the employees tested are entirely innocent of wrongdoing does not impugn the program's validity.") and *Harmon v. Thornburgh*, 878 F.2d 484, 487–488 (D.C.Cir.1989), quoting that sentence from *Von Raab*). Instead *Von Raab*, 109 S.Ct. at 1390 reconfirmed the balancing test for evaluating employee drug tests first described in *Skinner*:

[O]ur cases establish that where a Fourth Amendment intrusion serves special governmental needs, beyond the normal need for law enforcement, it is necessary to balance the individual's privacy expectations against the Government's interests to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context.

5. *Von Raab*, 109 S.Ct. at 1391 has also rejected the need for a warrant as a prerequisite to such testing in the employment context (and see this Court's opinion in *Draper v. City of Chicago*, No. 88 C 10140, slip op. at 5, 1989 WL51184 (N.D.Ill. May 3, 1989)).

■ 6. Instead of the application of absolute standards or preconditions, courts dealing with the validity of governmentally-required drug testing programs must determine, as the ultimate question, the "reasonableness" of the search implicated in such testing. Although *Von Raab* did not

---

12. *Roland Machinery*, 749 F.2d at 387 (quoting *Omega Satellite Products Co. v. City of Indianapolis*, 694 F.2d 119, 123 (7th Cir.1982)) defines a plaintiff's "likelihood of success" burden in very modest terms: It is enough that "the plaintiff's chances are better than negligible...." That low threshold tends to counteract the degree of credence normally ascribed to governmental reasons advanced to justify statutory or regulatory restrictions. These Conclusions should be read in light of the opposing forces identified in this footnote, together with the *Von Raab*-dictated balancing test.

articulate an analytical framework for evaluating such programs (*Harmon*, 878 F.2d at 488), clearly the reasonableness inquiry requires weighing individual privacy interests against the government's policy objectives. Several post-*Von Raab* cases have utilized just such a balancing test (see, e.g., *Harmon*, 878 F.2d at 488–489; *Connelly v. Horner*, No. C88–5085–DLJ, slip op. at 8–9, 1989 WL 125011 (N.D.Cal. June 15, 1989); *Nat'l Treasury Employees Union v. Watkins*, 722 F.Supp. 766, 769 (D.D.C.1989)). That calls for a fact-based inquiry.

*Board's Asserted Interests*

7. As Finding 9 reflects, Board has consistently asserted two reasons for implementing the Rule: integrity of the industry and safety of the participants. Because the arguments Board tenders on the current motion are somewhat broader than the rationale in Rule § 508.10(c), some further elaboration is in order.

8. Before this Court, Board advances an integrity rationale containing two separate components:

(a) Licensees who use drugs are assertedly peculiarly susceptible to bribes or "other improper influences" (presumably blackmail).

(b) Any use of drugs by licensees is said to be likely to impact on the public's perception of the fairness of racing. That in turn is predicted to result in fewer bets and decreased state revenue.

9. No evidence at all has been proffered to suggest that licensees who use drugs are more likely to be bribed or blackmailed than anyone who may engage in any other type of illegal activity. It might perhaps be an appropriate topic for judicial notice that someone who engages in unexposed illegal activity could be more likely to succumb to bribes or blackmail than an honest person (after all, the wrongdoer has something to hide). But that presumption cannot justify the random testing of licensees here. After all, the identical argument could be advanced to "justify" random and warrantless searches—without any basis for individualized suspicion—of any licensee's person to search for illegal handguns or any licensee's car to search for drugs. And it is no real answer to urge the conventional proposition that government is not required to deal with all perceived evils at once—what is significant is that even the unproved premise of susceptibility to bribes or blackmail should be examined in the factual matrix of the specific case.[13]

10. At least as problematic with this first prong of Board's integrity rationale is its obviously contrived nature—though it does arguably apply to some of the categories of affected employees, it is less than specious as to others. Board's concern as to bribes and blackmail is of course tied to possible race-fixing. But Outriders and Parade Marshals admittedly cannot affect the outcome of a race. And while Starters and Assistant Starters might theoretically do so, the videotaping of the entire starting process really eliminates that possibility. Only Jockeys and Drivers are truly in a position to affect the outcome of a race. In summary, Board's establishment of a universally applicable requirement, where only

**13.** This Court of course recognizes that *Von Raab*, 109 S.Ct. at 1395 accepted the argument that off-duty drug use "creates risks of bribery and blackmail against which the Government is entitled to guard." No doubt such drug use does create "risks," but the real issue for balancing purposes is how realistic that risk really is. *Von Raab* examined such a risk in the context of employees involved in front-line drug interdiction, so that the bribery and blackmail risks would come from the very criminals whose activities the employees were supposed to be curbing and whom the employees would be likely to encounter in the course of their duties. It stressed "the almost unique mission of the [Customs] Service" as the predicate for the Government's "compelling interest" and as the identified source of the "risks of bribery and blackmail" (*Von Raab*, 109 S.Ct. at 1395). By contrast, the licensees here fall into a dramatically different category—one involving no "extraordinary safety and national security hazards" (*id.*). In short, the situations are so materially different as not to call for a reasonable inference in *this* instance of a materially enhanced risk of likelihood of bribery or blackmail to place in the scales—at least in the complete absence of evidence to that effect from Board.

certain of its employees really pose the risks that Board has identified in support of that requirement, casts substantial doubt on the supporting rationale itself.

■ 11. Board's expressed concern over the public's perception of the racing industry presents a closer question. Because Illinois derives tax revenues from parimutuel betting, a decrease in betting decreases such revenues. Board says that if the public perceives that the races are not run fairly, the total dollar amount wagered will decline. *Shoemaker v. Handel*, 795 F.2d 1136, 1142 (3d Cir.1986) has accepted such a rationale in upholding the random testing of jockeys:

> New Jersey has a strong interest in assuring the public of the integrity of persons engaged in the horse racing industry. Public confidence forms the foundation for the success of an industry based on wagering. Frequent alcohol and drug testing is an effective means of demonstrating that persons engaged in the horse racing industry are not subject to certain outside influences. It is the public's perception, not the known suspicion, that triggers the state's strong interest in conducting warrantless testing.

12. *Shoemaker*, however, has to be recognized as overly simplistic in analytic terms—as a rationalization (in the psychological sense) rather than a true rationale. After all, *every* unknown variable that bettors believe may operate adversely has the potential to reduce the total amount wagered—people are less likely to bet if they think there are any unknown, outcome-determinative factors that influence results. Thus, if bettors believe race participants are not performing to the best of their abilities, so the race is not run fairly, it may be reasonable to infer the total dollar amount wagered will decline. But that is highly speculative if it is sought to be applied ipse dixit to the claimed relationship between drug testing and such public confidence in the fairness of racing. Indeed, even if that relationship were assumed to exist, any effort to quantify it in terms of a hypothesized decrease in total dollars wagered would be hopelessly speculative.[14] And on both relevant scores Board has presented no evidence whatever:

> (a) that any such perception of unfairness stemming from the absence of drug testing actually exists or
>
> (b) what any marginal decrease in state revenues as the result of invalidating the drug testing program might come to.

■ 13. Lest there be any doubt on this related subject, Board cannot rely upon a purely generic interest in preserving the integrity of the sport aside from a claimed decrease in state revenue. Any such generalized "integrity" justification of state-sponsored activity could serve equally well to support random urinalysis of state judges (for the State has an interest in assuring the public of their honesty), of state university professors (for the State has an interest in preserving students' perceptions that teachers are law-abiding citizens) or even of state legislators (for the State has an interest in preserving the perception of an honest legislative process, free of "outside influences"). Yet no one has even suggested the extreme position that such widespread testing is permitted because of the State's concern over integrity.[15]

14. In short, neither prong of Board's integrity argument is entitled to any real weight in the scales of the balancing process. Admittedly Board has an integrity interest, but the extent (if any) to which

---

14. This is not intended to thrust an impossible burden of proof on Board. What is meant to be conveyed is that in the type of balancing process mandated by *Von Raab*, it is important whether the marginal effect on betting and resulting state tax revenues (if it exists at all) is meaningful or merely makeweight.

15. Would the Operation Greylord convictions of several state court judges, to take the first reduc-tio ad absurdum example in this Conclusion, justify random urine testing of the entire class? Of course not. This obviously rhetorical question is, of course, simply intended to focus attention on the need for a legitimate identification of drug-related risks in real-world terms in the racing industry, rather than a program based only on the acknowledged evils of drugs in our society as such.

that interest is implicated in enjoining the random testing program at issue here is entirely speculative.

■ 15. Board also asserts a safety interest—it says horse racing is a dangerous activity that requires participants to be in peak condition. Horse racing does indeed involve some physical dangers: Finding 48 identifies the extent of injuries and deaths suffered by jockeys and drivers. But there are several reasons, dealt with in Conclusions 16 through 18, demonstrating that Board's expressed safety interest also does not carry substantial weight in the balancing process.

16. First, the safety rationale does not really extend to all licensees. Racing poses minimal risk to Outriders and Parade Marshals (the occasional loose horse must be retrieved) or stemming from the work of those employees. Nor is there a real safety risk for Starters and Assistant Starters:

(a) As for the former, he works on the infield side of the track, away from the horses.

(b) As for the latter, though the starting process could conceivably pose risks for them, no evidence suggests a real problem exists in that regard.

And again the work of those employees has not been shown to create risks justifying the challenged program. Thus Board's argument based on the dangers in racing has relevance only as to Jockeys and Drivers.

17. Second, Board's Rule does not require a licensee to provide a sample until just before the last race. Board thus has no way of knowing whether a licensee is impaired during most of that racing day. That being the case, the suggested justification based upon racing dangers really does not support the Rule as it is written.

18. Third and finally, urinalysis has inherent limitations in addressing any problems of physical dangers, for urinalysis cannot measure an individual's *present* impairment. Instead the tests identify only metabolites of previously ingested drugs.

19. Because urine testing thus does not have a direct impact on the safety factor relied on by Board, the only potential relevance of that factor is in its indirect impact as a deterrent: Licensees who know they are subject to testing may cease (or reduce) their drug use. While that notion has some facial appeal, the existence of any actual decrease in drug use is necessarily speculative—and the extent of any such decrease is doubly speculative. Although Board asserts random testing is a deterrent (DuPont Dep. 66), it presents no evidence even hinting at how much drug use is allegedly deterred and what effect that reduced use would have on safety.[16]

■ 20. In any event, any arguable safety concern here is quite different in kind from that dealt with in *Von Raab*, 109 S.Ct. at 1393. There the Court upheld urinalysis of employees who carry firearms—a clear means of enhancing *public* safety. In contrast, Board's concern over racing's human and equine participants centers on *private* interests. Although it would of course be wrong to discount the latter as lacking in value, in the balancing process a concern for private interests has less weight in supporting random urinalysis than the *Von Raab* concern for public safety.

21. In summary, this Court has reviewed the interests Board has advanced in support of random urinalysis and finds them weak at best. As the preceding Conclusions have demonstrated, each involves more than one level of speculation, and any piling of speculation on speculation attenuates the force of arguments in the same manner as the multiplication of fractions.

**16.** This Court should not be misunderstood as rejecting the potential deterrent effect of random testing. Both *Skinner,* 109 S.Ct. at 1419 and *Von Raab, id.* 109 S.Ct. at 1396 speak of drug testing as an effective means of deterring use of controlled substances in the first place. But for current purposes the critical point is that nothing has been tendered from which this Court can ascertain the *extent* of the deterrence—a vital question in a fact-based balancing inquiry such as this one. And that deficiency bulks even larger in light of the factor referred to in Conclusion 16: that any arguable safety justification applies only to two of the classes of licensees subject to testing (Jockeys and Drivers).

Board's evidence on its side of the scale carries little weight.

*Licensees' Privacy Interests*

■ 22. Board urges the licensees have a reduced expectation of privacy because the horse racing industry is pervasively regulated. *Shoemaker*, 795 F.2d at 1142 accepted that contention:

> It is also clear that the Commission historically has exercised its rulemaking authority in ways that have reduced the justifiable privacy expectations of persons engaged in the horse-racing industry. When jockeys chose to become involved in the pervasively-regulated business and accepted a state license, they did so with the knowledge that the Commission would exercise its authority to assure public confidence in the integrity of the industry.

Once more Board's argument is ultimately unpersuasive.

23. For one thing, our own Court of Appeals (though speaking, to be sure, in a different context) has held the Illinois horse racing industry is *not* so pervasively regulated as to call for relaxation of the Fourth Amendment's protection of individual participants in that industry (*Serpas v. Schmidt*, 827 F.2d 23, 27–28 (7th Cir.1987)).

24. Indeed, in an even more recent case in which our Court of Appeals upheld random testing of high school athletes, the opinion at least implied that situations such as the present one, where refusal to submit to the tests will result in loss of employment, would fall on a different playing field (*Schaill v. Tippecanoe County School Corp.*, 864 F.2d 1309, 1319 (7th Cir.1988)).[17]

25. *Von Raab*, 109 S.Ct. at 1394 (emphasis added) delivers the same message that only limited special circumstances can validate such infringement of the individual's privacy interest:

> We think Customs employees who are directly involved in the interdiction of

illegal drugs or who are required to carry firearms in the line of duty likewise have a diminished expectation of privacy in respect to the intrusions occasioned by a urine test. *Unlike most private citizens or government employees in general,* employees involved in drug interdiction reasonably should expect effective inquiry into their fitness and probity.

26. Admittedly the Illinois horse racing industry is pervasively regulated. Licensees must provide extensive background information to obtain their licenses. Every applicant for licensure must submit fingerprints. And as stated earlier, Jockeys and Drivers are assertedly subject to physical examinations. But the mere fact that the industry is regulated cannot carry the day. In that respect *Serpas*, 827 F.2d at 28 has said, quoting *Bionic Auto Parts and Sales, Inc. v. Fahner*, 721 F.2d 1072, 1079 (7th Cir.1983):

> [T]he degree and extent of past regulation comprise but a part, albeit a substantial part, of a determination of a "reasonable expectation of privacy" under the Fourth Amendment. Otherwise, no protections at all would be appropriate in closely regulated industries. The Fourth Amendment requires that a determination of the "reasonableness" of the intrusion be made. Even in closely regulated industries, the inspection provisions still must be tailored to the state's proper objectives, and they must minimize the dangers inherent in the unbridled exercise of administrative discretion.

27. This Court declines Board's invitation to stretch (or to evade) existing precedent to hold that an individual's mere participation in a heavily regulated industry automatically signals a waiver of Fourth Amendment protection. None of the licensees here can be said to have expected or consented to the privacy intrusions associated with random urinalysis.[18] There is a

---

**17.** Relatedly *Schaill, id.* at 1322 (emphasis added) said the high school testing of athletes was:

> one of the relatively *unusual* environments in which suspicionless searches are permissible.

**18.** Nor is this point limited to people who have made long-standing career choices to go into the racing industry. It has long been recognized that Justice Holmes' classic aphorism "No one has a constitutional right to be a policeman"

material difference between furnishing the background information Board requires before issuing a license and undergoing the highly personal privacy intrusion of urinalysis. And such cases as *Serpas* preserve the rights of persons in the regulated industries to challenge the future imposition of Fourth–Amendment–violative restrictions.

28. Moreover, because the testing plan here is random and subjects licensees to up to five tests in a year, it imposes a greater infringement on the privacy interests of the employees than other plans that have passed constitutional muster (accord, *Connelly*, slip op. at 18). Such multiple random testing is materially different from a one-time test administered upon acceptance of a new position (*Von Raab*) or a test administered after a triggering event has suggested employee negligence (*Skinner*).

29. In sum, *Serpas* and *Schaill* teach licensees do *not* have a diminished expectation of privacy simply because the industry in which they participate is heavily regulated. Nor are any of the unique factors found persuasive in *Von Raab* and *Skinner* present here. Like any other private citizen, plaintiffs have the right to expect that their privacy interests will be protected.

*Balancing of Interests*

30. Given Board's weak justifications for the random testing and the fact that plaintiffs maintain a legitimate right to be free from highly intrusive searches, plaintiffs have established more than a "reasonable likelihood of success" (as defined in *Roland Machinery*) in ultimately invalidating Board's random testing procedure under the searchlight of Fourth Amendment scrutiny. Board's assertions of governmental needs and of a reduced expectation of privacy on the part of licensees do not tip the scales in the manner required to avoid that "reasonable likelihood of success" conclusion.

31. One final point is worth making in the balancing inquiry: It goes without saying that Board's asserted interests in integrity and safety in the industry it supervises are laudable policy goals. But the rule of law must govern even the best-intentioned of administrators who seek to bend or break the Constitution to attain desired (and even desirable) ends. Board has not presented sufficient evidence to demonstrate either:

(a) the extent of its enforceable interests or

(b) whether random testing advances those goals.

32. In such a case, this Court must err (if at all) on the side of the plaintiffs—and particularly so in applying the low-threshold "reasonable likelihood of success" test. Where constitutional rights are at issue, no court should automatically accept at face value any argument (no matter how tenuous) that might potentially justify the attempted search. It is almost always possible for a governmental actor to conjure up a justification for an intrusion on fundamental constitutional values that has surface plausibility. Blind acceptance of such purported justifications must be avoided.

33. It is therefore concluded that Class Plaintiffs have at least a substantial likelihood of success (in *Roland Machinery* terms) on the merits of their challenge to Board's random urinalysis requirements.

*Other Roland Machinery Factors*

34. Board has chosen to concentrate its fire on the merits inquiry, seemingly acknowledging that Class Plaintiffs meet the other *Roland Machinery* factors (see D. Proposed Conclusions of Law 17). In any event Class Plaintiffs do satisfy the other factors necessary to secure preliminary injunctive relief: [19]

(a) *Class Plaintiffs have no adequate remedy at law. Roland Machinery*, 749 F.2d at 386 establishes a plaintiff has no adequate remedy at law if damages at

should be the prelude to, and not the end of, constitutional analysis in cases such as this.

**19.** Except to the extent changes are called for by the different stage this action has now reached,

what follows is taken directly from the TRO, where this Court reached the identical conclusions in the context of the parties' presentations at the inception of this case.

the end of trial will be seriously deficient as a remedy for the harm suffered by plaintiff. Here Class Plaintiffs ultimately seek declaratory and injunctive relief rather than damages. Damages will not provide an adequate remedy for the violation of the important Fourth Amendment rights in issue in this case.

(b) *Class Plaintiffs will suffer irreparable harm if a preliminary injunction is not issued.* Board's proposed deprivation of Class Plaintiffs' right to be free from unreasonable searches and seizures constitutes irreparable harm, even if the time period of such deprivation were a short one (cf. *Elrod v. Burns,* 427 U.S. 347, 373–74, 96 S.Ct. 2673, 2689–90, 49 L.Ed.2d 547 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury")). Other courts have found individuals' subjection to unlawful searches constitutes irreparable harm for purposes of granting preliminary injunctive relief (see, e.g., *Illinois Migrant Council v. Pilliod,* 540 F.2d 1062, 1071 (7th Cir.1976); *McDonell v. Hunter,* 746 F.2d 785, 787 (8th Cir.1984)).

(c) *Balancing of harms favors Class Plaintiffs.* Conclusion 34(b) speaks to the immediate and irreparable harm Class Plaintiffs will suffer if a preliminary injunction is not issued. In assessing the potential harm to Board if a preliminary injunction were later held to have been wrongfully issued, this Court notes that Board has sought to prove its Rule was promulgated in part on its perception that a drug problem has existed at Illinois racetracks since at least January 1, 1986. Board has offered no reason for its extended delay in instituting the Rule, nor has it offered any showing of any emergency requiring implementa-

tion of the Rule before this action is ultimately resolved on the merits. No interest asserted by Board is sufficiently compelling to require the immediate urine testing of Class Plaintiffs, in light of Board's own two-year delay in implementing the challenged program. Based on the relative harms that may be suffered by the parties, the Court finds the potential harm to Class Plaintiffs if a preliminary injunction is denied (wrongfully, it may be assumed for this purpose) by far outweighs any potential harm that may be occasioned to Board by the grant of a preliminary injunction (again wrongfully, as it may be assumed for this purpose).

(d) *Issuance of a preliminary injunction will not disserve the public interest. Roland Machinery,* 749 F.2d at 388 requires this Court to consider the consequences to third parties of an order granting or denying preliminary relief. In this case the "public interest," as it is termed in the case law, is identical to the interests that Board itself has asserted as justification for the Rule (that is, safety of the horse racing sport and the public's perception of the integrity of its participants). Accordingly this Court has already determined (by its just-completed "balancing of harms" conclusion) that the public interest will not be disserved by the issuance of a preliminary injunction.

35. Class Plaintiffs' motion for a preliminary injunction enjoining random urinalysis must therefore be, and is, granted.[20]

*Individualized–Suspicion Testing*

36. *Von Raab,* 109 S.Ct. at 1391–92 (ultimately quoting from *South Dakota*

---

**20.** Though nothing else really adds to the analysis, several matters merit brief attention. Class Plaintiffs vigorously attack the validity of a 1985 drug screening program conducted by Board. In light of the conclusion in *Von Raab,* 109 S.Ct. at 1395 that it is unnecessary to establish a documented drug problem, the issue really is irrelevant. On a different matter, Class Plaintiffs assert the testing program will be ineffective because licensees may attempt to adulterate the specimens. That odd logic was unpersuasive in the Supreme Court (*Von Raab,* 109 S.Ct.

at 1396), and it is equally so here. Finally, Class Plaintiffs assert the random drug tests are unreasonable because other less intrusive methods of determining impairment (such as neuropsychological testing and trained supervision) exist. While the manner of testing certainly bears on the overall reasonableness of the search, the method chosen by Board to carry out its objectives is really a policy question. This Court refuses to second-guess Board's decision in that respect.

*v. Opperman,* 428 U.S. 364, 370 n. 5, 96 S.Ct. 3092, 3097 n. 5, 49 L.Ed.2d 1000 (1976) (other citations omitted and emphasis in original)) states:

> Our cases teach, however, that the probable-cause standard " 'is peculiarly related to criminal investigations.' " ... In particular, the traditional probable-cause standard may be unhelpful in analyzing the reasonableness of routine administrative functions, ... especially where the Government seeks to *prevent* the development of hazardous conditions or to detect violations that rarely generate articulable grounds for searching any particular place or person.

*New Jersey v. T.L.O.,* 469 U.S. 325, 341, 105 S.Ct. 733, 742, 83 L.Ed.2d 720 (1985) delivered this message as to the appropriate standard in such situations of "suspicions that, although 'reasonable,' do not rise to the level of probable cause":

> Where a careful balancing of governmental and private interests suggests that the public interest is best served by a Fourth Amendment standard of reasonableness that stops short of probable cause, we have not hesitated to adopt such a standard.

37. Plaintiffs' primary concern with the individualized-suspicion testing permissible under the Rule is that it is standardless, allowing for testing upon the "mere hunch" of a steward (P. Proposed Conclusions of Law 101). But Guidelines at 3 requires:

> corroborated evidence or observable phenomena, such as direct observation of drug use or possession and/or physical symptoms of being under the influence of alcohol or drugs such as erratic behavior.

Thus the Guidelines prohibit testing unless there is:

> (a) corroborated evidence of drug use [21] or

(b) a direct observation of use, possession or physical symptoms of drug use. That certainly limits the discretion of the stewards to demand individualized suspicion testing.

38. In this case the public interest is best served by a reasonableness standard. Board admittedly has a legitimate interest in preserving the integrity and safety of the sport. That is enough to support the requirement of individualized-suspicion testing based on specific articulable facts that meet an objective requirement of "reasonable cause" (adequately distinguishing the lack of support for random testing). Such "reasonable cause" testing, properly supported by specific evidence, passes Fourth Amendment scrutiny (see, e.g., *Connelly,* slip op. at 25–26, upholding such "reasonable cause" testing as applied to investigators in the United States Office of Personnel Management).

39. In view of (a) the limited discretion granted to the stewards in this area, (b) *Von Raab's* admonition that a "probable cause" standard is peculiarly related to criminal investigations and (c) this Court's balancing of interests, individualized testing based on reasonable cause is held constitutional. Because plaintiffs are satisfied with a "reasonable cause" standard (see their Complaint's Prayer for Relief), no injunction as to the individualized-suspicion testing is warranted.

\* \* \*

For the reasons stated in these Findings and Conclusions, it is hereby ordered, adjudged and decreed that:

1. Farrel J. Griffin, David L. Diana, Ray H. Garrison, Thomas J. Garvey, Ralph Gonzalez, Irwin Jann, Hubert F. Messe, Cecil J. Troy and Dan K. Webb, and their officers, agents, servants, employees and attorneys and all persons in active concert or participation with any of the foregoing who receive actual notice of this order by

---

**21.** That corroboration requirement, requiring as it does "evidence" of drug use, does not specifically mandate that such evidence be of a type admissible in judicial proceedings. That means it does not expressly eliminate reliance on hearsay as a justification for demanding a urine sample. Absent any statement by Board to the contrary, however, this Court has read the Guidelines provision as encompassing "evidence" in the sense of admissibility (thus avoiding any need to resolve any potential question as to the validity of a different reading).

personal service or otherwise are hereby enjoined from:

(a) implementing and enforcing the random urine testing procedure contained in the Substance Abuse Rule promulgated by the Illinois Racing Board; or

(b) conducting mandatory urine tests of a Class Plaintiff for controlled substances without specific articulable facts that meet an objective standard of reasonable cause for believing such individual is under the influence of or has used a controlled substance on the grounds of a racetrack; or

(c) conditioning Class Plaintiffs' continued licensure with the Illinois Racing Board upon their submission to the urine tests prohibited in this preliminary injunction.

2. Class Plaintiffs shall be required to post a bond in the amount of $5,000 pursuant to Rule 65(c), which bond may be secured by the signature only of any Plaintiff.[22] This Court specifically finds that amount to be adequate security for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained (this is not a finding that Board has shown that any of its members or any other person enjoined will suffer any such harm if this preliminary injunction is found to have been wrongfully issued).[23]

3. This action is set for a status hearing at 9 a.m. September 8, 1989.

---

**22.** That bond may be a continuation (with any necessary language modifications) of the bond previously posted upon issuance of the TRO.

**23.** Board has filed a motion to dismiss under Rule 12(b)(6). In light of the disposition of plaintiffs' motion for a preliminary injunction, Board's motion is obviously denied as to plaintiffs' claim against the random testing and granted as to the claim based on individualized suspicion testing.