William SHOEMAKER, Angel Cordero, Jr., William Herbert McCauley, Philip Grove, and Vincent Bracciole, Appellants,

v.

Hal HANDEL, Executive Director of the New Jersey Racing Commission, Samuel A. Boulmetis, Steward Representing New Jersey Racing Commission, Joseph F. Piarulli, Associate Steward, Carl H. Hanford, Associate Steward, and Richard W. Lawrenson, Associate Steward.

No. 85–5655.

United States Court of Appeals, Third Circuit.

Argued April 18, 1986.

Decided July 10, 1986.

William L. Bowe (argued), Bowe & Rakinic, Woodbury, N.J., Edward A. Rudley, Philadelphia, Pa., for appellants.

Irwin I. Kimmelman, Atty. Gen. of N.J., James J. Ciancia, Asst. Atty. Gen., Steven Wallach (argued), Deputy Atty. Gen., Trenton, N.J., for appellees.

Before ADAMS, GIBBONS and WEIS, Circuit Judges.

### OPINION OF THE COURT

GIBBONS, Circuit Judge:

Five well-known jockeys appeal from an adverse decision in their action seeking declaratory and injunctive relief against officials of the New Jersey Racing Commission. The action challenges the constitutionality of regulations adopted by the Commission that permit the State Racing Steward to direct any official, jockey, trainer, or groom to submit to breathalyzer and urine testing to detect alcohol or drug consumption. The regulations provide for sanctions of varying severity, including lifetime suspension from racing for persons testing positive. The jockey plaintiffs contend that the regulations violate their rights under the fourth, fifth, ninth, and fourteenth amendments to the Constitution. After a trial the district court made findings of fact and conclusions of law in which all of the jockeys' challenges to the regulations were rejected. 619 F.Supp. 1089 (1985). We affirm.

### I.

The New Jersey Racing Commission regulates horse racing in that state. Its statutory powers include "full power to prescribe rules, regulations and conditions under which all horse races shall be conduct-

ed." N.J.Stat.Ann. § 5:5–30 (West 1973). The racing industry involves parimutual wagering, and the state receives a part of the revenue derived from such wagering. N.J.Stat.Ann. §§ 5:5–64, 5:5–64.1 (West Supp.1985).

> All parimutual employees and all horse owners, riders, agents, trainers, stewards, starters, timers, judges, grooms, drivers, and others, acting in any capacity in connection with the training of the horses or the actual running of the races in any such race meeting may be licensed by the commission, pursuant to such rules and regulations as the commission may adopt.

*Id.* § 5:5–33. Because the public wagers on the outcome of races, the Commission's regulations have focused upon the necessity for preserving both the fact and the appearance of integrity of the racing performances. Thus, for example, the Commission's regulations for many years have placed on the trainer of a horse the absolute duty, regardless of fault, to protect the horse from the administration of drugs that might affect its performance. *See Dare v. State ex rel. Department of Law and Public Safety, Division of New Jersey Racing Commission,* 159 N.J.Super. 533, 538–39, 388 A.2d 984, 986 (App.Div.1978)

(per curiam). Moreover to assure the discharge of this duty, the Commission's regulations have for many years provided for postrace specimen testing of horses and, if tests prove positive for a drug or foreign substance, for warrantless searches of the premises occupied by the stable involved. *See State v. Dolce,* 178 N.J.Super. 275, 284–87, 428 A.2d 947, 952–54 (App.Div. 1981). The present version of these regulations is in Subchapter 14A of the Commission's regulations, entitled Medication and Testing Procedures. N.J.Admin.Code tit. 13, §§ 70–14A.1 to 70–14A.11 (1985).

The regulations challenged in this action are also parts of Subchapter 14A. They were proposed by notice in the New Jersey Register in 1984 and adopted in January 1985, effective as of April 1, 1985. The first regulation requires that officials, jockeys, trainers, and grooms shall, when directed by the State Steward, submit to breathalyzer tests for the detection of alcohol.[1] The second regulation provides that every official, jockey, trainer, and groom for any race may be subjected to a urine test for the detection of use of "Controlled Dangerous Substance[s]", and may be subjected to sanctions for failure to submit to such a test, and for positive results in such a test.[2]

---

1. The regulation provides in full.

    Officials, jockeys, trainers and grooms shall, when directed by the State Steward, submit to a breathalyzer test and if the results thereof show a reading of more than .05 percent of alcohol in the blood, such person shall not be permitted to continue his duties. The stewards may fine or suspend any participant who records a blood alcohol reading of .05 percent or more. Any participant who records a reading above the prescribed level on more than one occasion shall be subject to expulsion, or such penalty as the stewards may deem appropriate.

    N.J.Admin.Code tit. 13, § 70–14A.10 (1985).

    This regulation is similar to a regulation that has applied to harness race drivers since 1969. N.J.Admin.Code tit. 13, § 71–18.1 (1985).

2. This regulation provides in full.

    (a) No licensee or official shall use any Controlled Dangerous Substance as defined in the "New Jersey Controlled Dangerous Substance Act", N.J.S.A. 24:21–1, et seq. or any prescription legend drug, unless such substance was obtained directly, or pursuant to a

valid prescription or order from a licensed physician, while acting in the course of his professional practice. It shall be the responsibility of the official, jockey, trainer and groom to give notice to the State Steward that he is using a Controlled Dangerous Substance or prescription legend drug pursuant to a valid prescription or order from a licensed practioner when requested.

    (b) Every official, jockey, trainer and groom for any race at any licensed racetrack may be subjected to a urine test, or other non-invasive fluid test at the direction of the State Steward in a manner prescribed by the New Jersey Racing Commission. Any official, jockey, trainer or groom who fails to submit to a urine test when requested to do so by the State Steward shall be liable to the penalties provided in N.J.A.C. 13:70–31.

    (c) Any official, jockey, trainer and groom who is requested to submit to a urine test shall provide the urine sample, without undue delay, to a chemical inspector of the Commission. The sample so taken shall be immediately sealed and tagged on the form provided

Shortly after the effective date of the regulations, the jockeys, all of whom are licensed by the Commission, filed this action pursuant to section 1983 of title 42 of the United States Code, 42 U.S.C. § 1983 (1982), seeking to restrain the Commission and its agents from enforcing the regulations on the grounds that the regulations were unconstitutional. The plaintiffs moved for a preliminary injunction, which the district court denied. The defendants moved for a dismissal of the complaint or for summary judgment, which the court also denied. After a bench trial the district court denied injunctive relief.

The district court's findings, which are not disputed, establish that jockeys are required to take a breathalyzer test daily, while grooms, trainers, and officials are tested less frequently. The breathalyzer apparatus is set up in or near the jockey's room and is run by an operator. The test, which requires that the jockey step up to a machine and breathe, is painless. The machine determines the level of blood alcohol from the expelled breath and indicates a positive reading by means of a red light visible to others in the room.

The district court found that while post-race urine tests are required "at the di-

by the Commission and the evidence of such sealing shall be indicated by the signature of the tested official, jockey, trainer or groom. The portion of the form which is provided to the laboratory for analysis shall not identify the individual official, jockey, trainer or groom by name. It shall be the obligation of the official, jockey, trainer or groom to cooperate fully with the Chemical Inspector in obtaining any sample which may be required to witness the securing of such sample.

(d) A "positive" Controlled Dangerous Substance or prescription drug result shall be reported, in writing, to the Executive Director or his designee. On receiving written notice from the official chemist that a specimen has been found "positive" for controlled dangerous substances or prescription legend drug, the Executive Director or his designee shall proceed as follows:

1. He shall, as quickly as possible, notify the official, jockey, trainer and groom involved in writing.

2. For an official, jockey, trainer or groom's first violation, he shall issue a written reprimand and warning and notify the official, jockey, trainer or groom that he will be subject to mandatory drug testing and that any further violation shall result in the sanctions described in paragraphs (3) and (4) below.

3. For an official, jockey, trainer or groom's second violation, he shall require the official, jockey, trainer or groom to enroll in a Supervisory Treatment Program approved by the New Jersey Racing Commission upon such reasonable terms and conditions as he may require. The official, jockey, trainer or groom shall be permitted to participate unless his continued participation shall be deemed, by the Executive Director or his designee, to be detrimental to the best interests of racing. It shall be the official, jockey, trainer or groom's responsibility to provide the Commission with written notice of his enrollment,

weekly status reports and written notice that he has successfully completed the program and has been discharged. If an official, jockey, trainer or groom fails to comply with these requirements, he shall be liable to the penalties provided in N.J.A.C. 13:70-31.

4. For official, jockey, trainer or groom's third or subsequent violation, he shall be liable to the penalties provided in Subchapter 31 and may only enroll into a Supervisory Treatment Program in lieu of said penalties, with the approval of the New Jersey Racing Commission.

(e) Any information received in the process of obtaining a urine sample, including but not limited to medical information, the results of any urine test, and any reports filed as a result of attending a Supervisory Treatment Program shall be treated as confidential, except for their use with respect to a ruling issued pursuant to this rule, or any administrative or judicial hearing with regard to such a ruling. Access to the information received and/or reports of any positive results and/or reports from a Supervisory Treatment Program shall be limited to the Commissioners of the New Jersey Racing Commission, the Executive Director and/or his designee, Counsel to the Racing Commission and the subject, except in the instance of a contested matter. In the instance of a contested matter, any information received and reports prepared shall not be disclosed without the approval of the Executive Director or his designee.

(f) Information received and reports prepared pursuant to this rule shall be stored in a locked secure area in the office of the Executive Director for a period of one year, after which time, they shall be destroyed. However, the Commission may maintain the information received and reports on individuals who have violated this rule for the purpose of recording the number of violations and the results of supervisory treatment, and for use should future violations occur.
N.J.Admin.Code tit. 13, § 70–14A.11 (1985).

rection of the State Steward," N.J.Admin. Code tit. 13, § 70–14A.11(b), the Commission has implemented the urine testing program by a method of random selection. The names of all participating jockeys at a given race are placed in an envelope. The State Steward or a representative draws the names of three to five jockeys for testing. A representative of the Jockey's Guild is invited to supervise the selection of names. The Commission may alter the number of names to be drawn each day. If a jockey's name is drawn more than three times in a seven-day period, the steward disregards the selection and draws another name. The jockeys whose names are selected must provide urine samples after their last race of the day. They are given plastic containers for this purpose. They are also required to fill out certification forms concerning the use of prescription or non-prescription medications. The certification form is to provide information about drugs covered by an exception in the regulations for any "substance ... obtained directly, or pursuant to a valid prescription or order from a licensed physician." N.J. Admin.Code tit. 13, § 70–14A.11(a). The form, as currently in use, provides for the optional disclosure of the condition for which the disclosed drug is a treatment. The certification forms contain two identical numbers. One number is removed and fastened to the urine sample, while the other number remains on the form. The anonymous urine sample is then sent to a laboratory for testing, and the form is sent to the Executive Director of the Commission and stored in a safe.

Urine test results are sent by the laboratory to the Executive Director and are available to that official, a designee, and the Commissioners. Pursuant to the express provisions of the regulations, the results are kept confidential even from the enforcement agencies. N.J.Admin.Code tit. 13, § 70–14A.11(e). The test results may only be used "with respect to a ruling issued pursuant to [section 70–14A.11], or any administrative or judicial hearing with regard to such a ruling." *Id.* The New Jersey Division of Criminal Justice, which is headed by the Attorney General, has issued an advisory opinion voicing no objection to the confidentiality regulation and stating that it is unaware of any statute that would require the Commission to report suspected drug use to any prosecutorial authorities. On May 24, 1985, while this action was pending, the Commission proposed amendments to the urine-testing regulation to broaden the confidentiality requirements so as to cover all information obtained pursuant to the rule, to prohibit disclosure without approval of the Executive Director of the Commission or a designee and to destroy test results after a year except when violations have been discovered. N.J.Admin.Code tit. 13, § 70–14A.11(f) (1985). During the comment period before the proposed amendments to the rule became effective the Commission treated the collected information as if the confidentiality amendments were in effect.

The breathalyzer regulation does not provide for the preservation of confidentiality of results nor for privacy of administration. N.J.Admin.Code tit. 13, § 70–14A.10. The Commission prefers, however, to administer the breathalyzer tests in private.

Jockeys "reduce" or lose weight quickly, by eliminating excess body fluids so as to lighten the load a horse must carry in a race. This lessens their ability promptly to provide postrace urine samples. Thus many jockeys selected for urine sampling have been delayed after their last race for up to an hour. If the State Steward determines that a jockey cannot provide a sample, the jockey is excused and retested the next day. If the jockey leaves without giving a sample or without being excused, the State Steward will notify the jockey of a hearing, and the jockey may be subject to the penalties. *See* N.J.Admin.Code tit. 13, § 70–31.3 (1982). Those penalties include fines, suspensions, and loss of license. *Id.*

Positive test results in the urine test may disclose not only use of drugs at the race track, but also off-premises drug use for as long as a week prior to the day of the test. The prohibition in the Commission's regulations against use of controlled substances

applies to any such use. N.J.Admin.Code tit. 13, § 70:14A.11(a).

## II.

The jockeys do not contend that jockeys with more than .05 percent of alcohol in their blood should be permitted to ride. Thus they do not challenge the substantive prohibition in section 70–14A.10. Nor do they contend that they should be free to use controlled substances. Rather, they contend (1) that both regulations are unconstitutional facially and as applied in that they authorize searches and seizures that violate the fourth amendment; (2) that the enforcement scheme deprives them of equal protection of the laws; and (3) that the enforcement scheme violates their constitutional right to privacy.

### A. The Fourth Amendment

The jockeys urge that neither the mandatory daily breathalyzer test nor the random urine test may be required without an individualized suspicion. The jockeys concede that if the racing officials are aware of specific objective facts suggesting that certain persons have recently used alcohol or drugs a warrantless production of a breath or urine sample could be demanded. Focusing particularly on section 70–14A.11(b), they contend that this regulation vests far too much discretion in the Commission as to who will be targeted for testing. The Commission does not argue that the mandatory tests do not involve a search or seizure within the meaning of the Fourth Amendment. Instead it urges that such warrantless searches or seizures by voluntary participants in the highly regulated racing industry are reasonable.

Since 1939, when article IV, section 7, paragraph 2 of the New Jersey Constitution was amended to make it lawful "to hold, carry on, and operate in this state race meetings whereat the trotting, running or steeplechase racing of horses ... may be conducted ... at which the pari-mutuel system of betting shall be permitted," [3] the horse racing industry has been among the state's most highly regulated industries. That constitutional provision was implemented in legislation that established the Commission and gave it broad rulemaking authority. See Pub.L. 1940 c. 17, §§ 1–58 (codified as amended at N.J. Stat.Ann. § 5:5–22 to 5:5–99 (West 1973 and West Supp.1985)). From its initial enactment, the statute permitted the licensing of all employees in the industry. Pub.L. 1940, c. 17, p. 74, § 13 (codified as amended at N.J.Stat.Ann. § 5:5–33 (West Supp. 1985)). Because of the state's interest in the revenue generated by wagering and the vulnerability of the industry to untoward influences, the statute has always provided that no person could be employed in any capacity at a racetrack "who has been convicted of a crime involving moral turpitude." Pub.L. 1940, c. 17, p. 75, § 14 (codified at N.J.Stat.Ann. § 5:5–34).[4] From the beginning the Commission has had the authority to prescribe conditions under which licenses may be issued and revoked. N.J.Stat.Ann. § 5:5–33. Thus all licensees have always participated in the industry with full awareness that it is the subject of intense state regulation. Those regulations have two separate but interrelated

---

**3.** *See* N.J. Const. 1844, art. IV, § 7, par. 2, as amended in 1939. The 1939 amendment is reprinted in *Revised Statutes of New Jersey Cumulative Supplement Laws of 1938 & 1939* XVI (J. Sarnoff ed. 1940). *See also Atlantic City Racing Ass'n v. Attorney General,* 98 N.J. 535, 541, 489 A.2d 165, 168 (1985) (reprinting the 1939 amendment). In 1947 New Jersey revised its 1844 Constitution. The current version of article iv, section 7, paragraph 2 does not contain any specific reference to pari-mutuel betting on horse racing. *See* N.J. Const. 1947, art. IV, § 7, par. 2, *reprinted as amended in* N.J.Stat.Ann. (West.Supp.1985). Instead the authority for betting on horse racing allowed by the 1939 amendment was incorporated by indirect reference in the first clause of article IV, section 7, paragraph 2 of the 1947 Constitution. *See* 1 & 2 *State of New Jersey Constitution Convention of 1947,* 355, 427–47, 1095.

**4.** The literal stricture of this provision probably is modified by the Rehabilitated Convicted Offenders Act, N.J.Stat.Ann. §§ 2A:168A–1 to 168A–6 (West 1985). *See Maietta v. New Jersey Racing Comm'n,* 183 N.J.Super. 397, 444 A.2d 55, 59–60 (App.Div.1982), *aff'd,* 93 N.J. 1, 459 A.2d 295 (1983).

purposes: the protection of the wagering public, and the protection of the state's fisc by virtue of the wagering public's confidence in the integrity of the industry.

■ In general a warrant is required for a search to be considered reasonable under the fourth amendment. *See, e.g., Payton v. New York,* 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980); *See v. City of Seattle,* 387 U.S. 541, 545, 87 S.Ct. 1737, 1740, 18 L.Ed.2d 943 (1967). In closely regulated industries, however, an exception to the warrant requirement has been carved out for searches of premises pursuant to an administrative inspection scheme. *See, e.g., Donovan v. Dewey,* 452 U.S. 594, 602–05, 101 S.Ct. 2534, 2539–41, 69 L.Ed.2d 262 (1981) (coal mines); *United States v. Biswell,* 406 U.S. 311, 316–17, 92 S.Ct. 1593, 1596–97, 32 L.Ed.2d 87 (1972) (gun selling); *Colonnade Catering Corp. v. United States,* 397 U.S. 72, 76–77, 90 S.Ct. 774, 776–77, 25 L.Ed.2d 60 (1970) (liquor industry). Although it it clear that the New Jersey horse-racing industry is closely regulated, the question that arises in this case is whether the administrative search exception extends to the warrantless testing of persons engaged in the regulated activity.

■ There are two interrelated requirements justifying the warrantless administrative search exception. First, there must be a strong state interest in conducting an unannounced search. *See Donovan,* 452 U.S. at 600, 100 S.Ct. at 1387. Second, the pervasive regulation of the industry must have reduced the justifiable privacy expectation of the subject of the search. *Id.* Both these requirements are present in the warrantless testing of persons involved in the New Jersey horse racing industry.

■ New Jersey has a strong interest in assuring the public of the integrity of the persons engaged in the horse racing industry. Public confidence forms the foundation for the success of an industry based on wagering. Frequent alcohol and drug testing is an effective means of demonstrating that persons engaged in the horse racing industry are not subject to certain outside influences. It is the public's perception, not the known suspicion, that triggers the state's strong interest in conducting warrantless testing.

It is also clear that the Commission historically has exercised its rulemaking authority in ways that have reduced the justifiable privacy expectations of persons engaged in the horse-racing industry. When jockeys chose to become involved in this pervasively-regulated business and accepted a state license, they did so with the knowledge that the Commission would exercise its authority to assure public confidence in the integrity of the industry. Even before the regulations challenged here were adopted, the jockeys were aware that the Commission had promulgated regulations providing for warrantless searches of stables. In addition, unlike the traditional warrantless search situation, the searches at issue in this case are not unannounced. The jockeys were put on notice that after April 1, 1985 they would be subject to warrantless testing on days that they were engaged to race.

Consequently, while there are distinctions between searches of premises and searches of persons, in the intensely-regulated field of horse racing, where the persons engaged in the regulated activity are the principal regulatory concern, the distinctions are not so significant that warrantless testing for alcohol and drug use can be said to be constitutionally unreasonable. We therefore hold that the administrative search exception applies to warrantless breath and urine testing of employees in the heavily regulated horse-racing industry.[5]

Having determined that the administrative search exception applies to the testing

5. Our holding applies only to breathalyzer and urine sampling of voluntary participants in a highly-regulated industry. Thus it should not be read as dispositive of the distinct issue presented in testing of children subject to mandatory school attendance laws or the testing of motor vehicle drivers.

of persons engaged in the horse racing industry, there remains the question whether the discretion of the Commission in conducting these searches is sufficiently circumscribed. There is a difference between the manner in which the breathalyzer regulation has been implemented and the manner in which the urine testing regulation has been implemented. Each jockey is required to take a breathalyzer test daily. Thus as this program has been implemented there is no room for standardless discretion. Every jockey knows that an alcohol blood level greater than .05 percent will be detected. The jockeys complain that section 70–14A.10 could be construed to vest standardless discretion in the State Steward, and thus to countenance the abuses anticipated by the Supreme Court in *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978). As the district court found, however, as to jockeys it has not been so construed. If it should be, the jockeys are free to return to the district court to litigage that issue.[6]

The urine testing regulation provides that every jockey "may be subjected to a urine test." N.J.Admin.Code tit. 13, § 70–14A.11(b). The trial court found that while all jockeys are at risk of such a test, not all are selected each day. Thus the question presented by the urine testing program as it operates is whether the random selection method is consistent with the requirements of the fourth amendment.

■ Random searches and seizures that have been held to violate the fourth amendment have left the exercise of discretion as to selected targets in the hands of a field officer with no limiting guidelines. *See, e.g., Delaware v. Prouse*, 440 U.S. 648, 661, 99 S.Ct. 1391, 1400, 59 L.Ed.2d 660 (1979); *United States v. Brignoni-Ponce*, 422 U.S.

873, 882–84, 95 S.Ct. 2574, 2580–82, 45 L.Ed.2d 607 (1975). In the present case the urine tests are mandated by the administrative scheme. The State Steward has no discretion in conducting the tests. Moreover the State Steward has no discretion as to who will be selected for urine testing. That choice is made by a lottery. The determination that a daily program of urine testing at the track, with targets selected randomly, was the most effective means for allocating available resources was made by the Commission, not the field officers. Thus we hold that daily selection by lot of jockeys to be subjected to urine testing does not violate the fourth amendment.[7] *See United States v. Martinez-Fuerte*, 428 U.S. 543, 564–66, 96 S.Ct. 3074, 3085–87, 49 L.Ed.2d 1116 (1976) (holding valid search at checkpoint selected by officials responsible for allocating law enforcement resources).

### B. Equal Protection

■ The jockeys point out that, while all jockeys must submit to a daily breathalyzer test, officials, trainers, and grooms are not subjected to daily testing and that only the jockeys are currently subjected to random selection for the urine testing. Relying on *Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886), they contend that such selective enforcement denies jockeys the equal protection of the laws. The district court rejected this contention, relying primarily on the fact that safety concerns are greatest during the running of a race when most serious accidents can occur. The jockeys counter, however, that while this justification may suffice with respect to the breathalyzer tests, it hardly suffices with respect to urine testing, which occurs after the race, not before.

We prefer to rest our affirmance with respect to urine testing on a different

---

6. This issue would not be foreclosed by our holding that the regulation as applied—requiring all jockeys to submit to a warrantless breathalyzer test on each racing day—does not violate the fourth amendment.

7. To the extent that our holding, that the state may validly seize breath and urine samples from voluntary participants in the regulated

racing industry without a warrant, is inconsistent with the reasoning of *Security and Law Enforcement Employees, Dist. Council 82 v. Carey*, 737 F.2d 187 (2d Cir.1984), we decline to follow that decision. That case held unconstitutional random strip and cavity searches of prison employees for contraband. Choice of targets was not made by lot.

ground. As previously noted, the intense regulation of the racing industry is justified because of public wagering on the outcome of races. Substance abuse by jockeys, who are the most visible human participants in the sport, could affect public confidence in the integrity of that sport. While the state's interest in the appearance of integrity reaches all participants, it is obviously greatest with respect to jockeys. The governing equal protection principle is that the state may rationally take one step at a time. *See, e.g., Williamson v. Lee Optical, Inc.,* 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955) ("Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind."); *Railway Express Agency, Inc. v. New York,* 336 U.S. 106, 110, 69 S.Ct. 463, 465–66, 93 L.Ed. 533 (1949) ("It is no requirement of equal protection that all evils of the same genus be eradicated or none at all."). Thus we find no merit in the jockeys' equal protection challenge.

### C. The Right of Privacy

 The jockeys contend that the breathalyzer and urine testing, which involve the collection of medical information, violate their rights of privacy with respect to such information. While both the Supreme Court and this court have recognized a right of privacy in medical information, governmental concerns may support the access to such information where the information is protected from unauthorized disclosure. *See Whalen v. Roe,* 429 U.S. 589, 602, 97 S.Ct. 869, 878, 5 L.Ed.2d 64 (1977); *United States v. Westinghouse Electric Corp.,* 638 F.2d 570, 577 (3d Cir.1980). The Commission's concern for racing integrity justifies its access to the breathalyzer and urinalysis information. The jockeys' concern, therefore, is limited to confidentiality. The jockeys concede that the regulatory amendments concerning confidentiality, proposed while their action was pending and put into effect by the Commission before becoming final, *see* N.J.Admin.Code tit. 13, § 70:14A.11(f) (1985), would satisfy their concerns if the amendments were enforced by an injunction or a declaratory

judgment. The district court found no reason to grant declaratory or injunctive relief. We find no abuse of discretion. If the Commission ceases to comply with the proposed confidentiality rules, the jockeys may return to court with a new lawsuit. Their privacy contentions, in the circumstances of this case, are not ripe for adjudication.

### Conclusion

We conclude that none of the proffered grounds for reversal of the district court's judgment have merit. The judgment will therefore be affirmed in all respects.